**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

RADANNA S. GONZALEZ and
KEITH GONZALEZ, her husband,

       Plaintiffs,

                               Case No. 3:14-cv-419-J-34JBT

vs.

UNITED STATES OF AMERICA,

       Defendant.

_____/

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

**THIS CAUSE** is before the Court for the entry of findings of fact and conclusions of

law. This action arises out of a minor motor vehicle accident that occurred in Jacksonville,

Florida on November 29, 2012. At the time of the accident, Plaintiff Radanna Gonzalez

was a passenger in a minivan driven by her daughter, Danielle Gonzalez-Peirson. Michael

Santiago, an employee of the United States Postal Service (USPS), was driving a postal

truck owned by the United States. Santiago and Peirson were stopped next to each other,

both waiting to exit the parking lot of an office center, when Santiago began to turn right

and collided with the front left fender of the minivan. As a result of the collision, Radanna

Gonzalez, as well as her husband Keith Gonzalez, filed the instant action against the

United States seeking compensation under the Federal Tort Claims Act, 28 U.S.C. §

1346(b) (FTCA).

The United States has waived sovereign immunity in limited circumstances for

claims for money damages against the United States for injury, death, or loss of property

caused by the negligent or wrongful act or omission of a federal employee while acting

within the scope of his employment. <u>See</u> 28 U.S.C. § 1346(b)(1). The parties have stipulated that on November 29, 2012, Santiago was an employee of the USPS acting within the scope of his employment, and the Court accepts that Santiago is a federal employee for purposes of the FTCA. <u>See</u> Pretrial Statement (Doc. 49) at 24.

This Court has subject matter jurisdiction to hear properly filed FTCA claims arising in the Middle District of Florida. The accident at issue is alleged to have occurred within the Jacksonville Division of the Middle District of Florida. Prior to filing suit, Plaintiffs Radanna and Keith Gonzalez each submitted a timely administrative tort claim giving the United States notice of their claims. <u>See</u> Pretrial Statement at 24-25. The United States denied the claims. Having exhausted their administrative remedies, Plaintiffs filed the instant action over which the Court finds that it has subject matter jurisdiction.

Pursuant to the FTCA, the United States can be held liable in tort in the same manner and only to the same extent as a private individual under like circumstances. 28 U.S.C. § 2674. In considering claims brought under the FTCA, the Court applies the substantive law of the place where the claim arose. <u>See</u> 28 U.S.C. § 2674. Thus, the substantive law of the State of Florida is applicable in this case. In the State of Florida, a plaintiff bears the burden of proving all four elements of negligence by the greater weight of the evidence. <u>See</u> <u>Jefferies v. Amery Leasing, Inc.</u>, 698 So. 2d 368, 370-71 (Fla. 5th DCA 1997); Fla. Std. Jury Instr. (Civil) 401.2 & 401.3. To prevail on a claim of negligence, a plaintiff must establish the following:

> 1. A duty, or obligation, recognized by the law, requiring the [defendant] to conform to a certain standard of conduct, for the protection of others against unreasonable risks.
> 2. A failure on the [defendant's] part to conform to the standard required: a breach of the duty . . . .
> 3. A reasonably close causal connection between the conduct and the

> resulting injury. This is what is commonly known as 'legal cause,' or 'proximate cause,' and which includes the notion of cause in fact.
> 4. Actual loss or damage . . . .

See <u>Curd v. Mosaic Fertilizer, LLC</u>, 39 So.3d 1216, 1227 (Fla. 2010) (quoting <u>Clay Elec. Co-op., Inc. v. Johnson</u>, 873 So.2d 1182, 1185 (Fla. 2003)).

In their Amended Complaint (Doc. 5), Plaintiffs allege that Santiago negligently operated the USPS truck causing it to collide with Radanna Gonzalez's vehicle and legally causing certain injuries to her, as well as her vehicle. The United States does not dispute that Santiago's negligence was the sole cause of the accident, and the undisputed evidence before the Court supports such a finding. Nonetheless, the United States contends that the accident was not the cause of Radanna Gonzalez's subsequent medical problems. Thus, the sole issues in this case are whether the collision can be considered a legal cause of injury to Radanna Gonzalez, and if so, the extent of her damages, any damages for loss of consortium to Keith Gonzalez, and the extent of damage to Plaintiffs' vehicle.

The Court conducted a five-day bench trial spanning October 25-27, 2016, and November 1-2, 2016, <u>see</u> Minute Entries (Docs. 63-65, 68-69).[1] Numerous witnesses testified in person. Plaintiffs called Carol Crocker, Danielle Laree-Gonzalez-Peirson, Mark Emas, M.D., Marlene Thomas, Krystal Sykes, Christopher Roberts, M.D., John B. Roberts, M.H.S., Keith and Radanna Gonzalez, Adriana McClerren and J. Rody Borg, Ph.D. Plaintiffs also presented the testimony of Samuel Hess, M.D., by video deposition. The United States called Robynanne Cash-Howard, Marc D. Kaye, M.D., M. John Von Thron,

---

[1] The exhibits admitted at trial are reflected in the Joint Trial Exhibit List (Doc. 70, Ex.), filed on November 2, 2016. The transcript of the bench trial is located in the record at docket entries 72-76, which the Court will cite to as Transcript volumes 1-5, respectively.

M.D, Fremont P. Wirth, M.D, Michael Santiago, and Lance Ferrelli.  Additionally, the Court reviewed evidence introduced by the parties, including Radanna Gonzalez's extensive medical records, and photographs of the scene of the accident and the vehicles.  With the Court's permission, on January 6, 2017, the parties also submitted into evidence a Joint Stipulation Regarding Post Trial Off-Sets and Contractual Disputes (Doc. 81; Off-Set Stipulation).  See Minute Entry (Doc. 69).  After the close of the evidence, the parties filed proposed findings of fact and conclusions of law.  See United States' Proposed Findings of Fact and Conclusions of Law (Doc. 80; Government Proposal); Plaintiffs' Proposed Findings of Fact and Conclusions of Law (Doc. 82; Gonzalez Proposal), both filed January 6, 2017.

Having reviewed the pleadings, examined the evidence, observed the witnesses, and considered the arguments of counsel, as well as the remainder of the record, the Court makes the following findings of fact and conclusions of law as required by Rule 52(a) of the Federal Rules of Civil Procedure (Rule(s)).

## I.    Findings of Fact[2]

### A.    The Accident and Aftermath

The accident occurred on Thursday, November 29, 2012, around 5:00 p.m., when Danielle Gonzalez-Peirson, Plaintiff Radanna Gonzalez's daughter, was giving her mother a ride home from the Allstate Insurance office where Gonzalez worked in Jacksonville, Florida.  Peirson was driving Gonzalez's Chrysler Town & Country minivan, and Gonzalez was riding in the front passenger seat with her seatbelt fastened.  Having just picked up Gonzalez, Peirson intended to exit the parking lot of the office center by turning right onto

---

[2] For ease of reference, the Court will refer to Plaintiff Radanna Gonzalez as "Gonzalez," and to her husband by his full name, Keith Gonzalez.

Atlantic Boulevard. Peirson pulled into the right-turn exit lane of the parking lot next to a USPS "2-ton" mail truck, driven by Michael Santiago, which was idling in the left turn lane, directly to the left of Peirson and Gonzalez. Failing to observe the minivan stopped next to him, Santiago began to make a right turn from the left turn lane and collided with the front left fender of the minivan. At the time of the collision, Santiago was traveling no more than 5 mph.

Upon impact, the postal truck dragged the minivan forward but stopped before entering the roadway. The impact of the collision caused the minivan to jerk up and down, and back and forth, sharply jostling Peirson and Gonzalez.[3] A police officer was called to the scene and cited Santiago for careless driving. Santiago called and reported the accident to his supervisors, Terry Atkinson and Carol Crocker, and they also came to the scene. Santiago told his supervisors that he did not see Gonzalez's vehicle, and the USPS found Santiago at fault for the accident.

Although the collision did not damage the postal truck, Gonzalez's minivan sustained damages to the front bumper, as well as the left front headlight, fender, and door. After the accident, Gonzalez drove her minivan to a parking spot at the office center, and her employer, Lance Ferrelli, gave Gonzalez and her daughter a ride home. Gonzalez

---

[3] Both Gonzalez and Peirson testified that Santiago attempted to "disentangle" the postal truck from the minivan by driving the postal truck "back and forth" a "couple" of times. Santiago testified that he stopped the postal truck upon impact and never attempted to put the truck in reverse. Upon hearing the testimony of Gonzalez and Peirson, as well as that of Santiago, and reviewing the pictures of the accident, the Court rejects the contention that Santiago drove the truck backward and forward in an attempt to dislodge the vehicles. The Court finds it more probable that any back and forth motion that Gonzalez and her daughter felt was the natural rocking of the large truck after Santiago pressed his brakes and put the truck in park. The Court finds that Gonzalez and Peirson's descriptions of their experience upon impact are exaggerated. For example, one or both of these witnesses characterized the accident as "very severe," described the impact as "violent," or referred to being "slammed" inside the vehicle. The Court, having heard the testimony and examined the accident pictures, is convinced that Gonzalez and Peirson's description of the event is inaccurate, inflated, and not due to be credited.

testified that she experienced a "funny sensation" in her lower extremities at the scene of the accident, but she did not experience any pain at that time. Indeed, Gonzalez did not tell her daughter, employer, the law enforcement officer or anyone else at the scene that she was experiencing any pain or discomfort. Later that evening, and over the following days, Gonzalez felt stiff and sore from the accident and developed a burning sensation radiating down her left thigh.

On Friday, November 30, 2012, the day after the accident, Gonzalez did not report to work and spent several hours with Peirson at the Department of Motor Vehicles (DMV) attempting to obtain the documents and registrations necessary to drive a different vehicle. Although Gonzalez did not obtain any medical treatment on Friday, she did contact two attorneys. After firing the first attorney she contacted, Gonzalez hired John Thomas, an attorney she knew from her church, and he helped her set up an appointment with a neurologist, Mark Emas, M.D., for the coming Monday. Gonzalez testified that she was in significant pain over the weekend, however, she did not attempt to obtain any medical care prior to her appointment with Emas.[4]

Gonzalez first obtained medical care four days after the accident, on Monday, December 3, 2012. The night before, Gonzalez called her employer and told him that she would not be in to work on Monday because she had a fever. Ex. 56, ALLSTATE_0022. Gonzalez acknowledged at trial that this excuse was not true, and that she intentionally

---

[4] Gonzalez emphasizes that Monday was the next available business day on which to see Emas. However, her medical records reveal that Gonzalez has a history of routinely visiting emergency rooms when she is in pain. For example, in 2001, Gonzalez reported to Memorial Hospital for emergency care the morning after she slammed her hand in a car door. Ex. 36, Memorial_0227, 0217. Thus, it is significant to the Court that on this occasion, Gonzalez opted not to go to the emergency room for immediate care.

misled her employer.[5]  Gonzalez also told her employer that she may or may not be at work on Tuesday.  Ex. 56, ALLSTATE_0022.  Notably, on Tuesday afternoon, Gonzalez drove the minivan to two different auto repair shops to obtain estimates for the cost to repair the minivan.  Gonzalez received one estimate in the amount of $1,940.23, and the other for $1,651.49.  Exs. 15, 16.  However, because of the high cost, Gonzalez did not have the car repaired professionally.  Rather, Gonzalez's husband and brother made some repairs to the minivan, and Gonzalez continued to drive the vehicle for several more months.  On June 18, 2013, Gonzalez traded the minivan to an auto dealership as part of the purchase of a car and received a $900 credit.  Ex. 17.

On December 5, 2012, Ferrelli met with Gonzalez to discuss moving her to a part-time schedule.  Ferrelli's decision to reduce Gonzalez's hours did not stem from the accident, but was the result of her history of chronic absenteeism.  Gonzalez and Ferrelli agreed that a part-time schedule was appropriate under the circumstances.  Ex. 56, ALLSTATE_0021.  On December 12, 2012, Gonzalez signed a document for submission to her insurance company stating that she was placed on a part-time schedule due to the accident, and sent the document to Ferrelli for his signature.  Ferrelli refused to sign the document because it was not true.  Id., ALLSTATE_0007.  Instead, Ferrelli revised the document to state that Gonzalez "was placed on part-time employment effective 12/17/2012 due to poor attendance leading to unacceptable work performance."  Id., ALLSTATE_0019.

---

[5] Gonzalez testified that she lied to her employer about why she was missing work because she "wasn't thinking clearly," and was afraid if she told him she was hurt from the car accident he would terminate her.  See Tr. vol. 3 at 49.  Notably, Ferrelli testified that in the first two months of Gonzalez's employment at Allstate, from early August to early October, Gonzalez failed to show up to work 23% of the time.  Ferrelli recalls that frequently Gonzalez called in sick with a fever or flu, and on other occasions missed work due to car problems.

Gonzalez testified that she was terminated from her employment with Allstate due to excessive doctor's appointments related to her injuries, but the Court rejects this testimony. Rather, the Court credits the testimony of Ferrelli, her employer, who stated that Gonzalez never told him that she was injured in the accident or needed to miss work to attend a medical appointment related to injuries she sustained in the accident. Ferrelli testified that he did not notice any change in Gonzalez after the accident, although he acknowledged that it would be hard for him to identify a difference since she did not come to work much after the accident. Ferrelli's employment records indicate that Gonzalez missed several days of work in late January and early February because she had "pink eye," the "flu" and was "sick." Id., ALLSTATE_0021. Notably, the Court is unable to identify even one single appointment related to this accident that conflicted with Gonzalez's part-time work schedule at Allstate. Gonzalez's employment with Allstate ended on February 4, 2013. On that date, after being out "sick" for several days, Gonzalez's employer asked her when she would be returning and she told him she had no idea. Then, when asked, she said she did not know what direction she wanted to take on her job. Her employer interpreted those statements to be a separation from employment and thus, her employment terminated. Id., ALLSTATE_0020.

**B.  Medical Care**

### i. Initial Evaluations and Treatment

As stated above, Emas, a neurologist, was the first doctor to examine Gonzalez following the accident. As documented in Emas' medical records, Gonzalez presented to Emas four days after the accident with complaints of "cervical, thoracic, and lumbosacral regional pain with intermittent numbness of the bilateral hand and a nearly constant burning

sensation with intermittent numbness to the lateral aspect of the left thigh." Ex. 26, EMAS_0026. Among other things, she reported to Emas that her past medical history consisted of a car accident from 23 years prior involving a "left leg contusion that fully resolved," and another car accident from 19 years ago in which she sustained a neck and back injury, including a bulging disc in her lumbar spine, but all symptoms had resolved. Id. After this initial evaluation, Emas diagnosed Gonzalez with post-traumatic myofascial paraspinous injuries to her cervical, thoracic, and lumbar spine, as well as left sacroiliitis. Id., EMAS_0028. Emas noted in the medical records that these injuries were the result of a November 29, 2012 motor vehicle accident. Id. Because Gonzalez reported intermittent numbness in her hands and left thigh, Emas also noted the possibility that Gonzalez was suffering from radiculopathies, i.e., pinched nerves in her neck and lumbar spine. Id. Emas prescribed physical therapy, as well as medications for pain (Lortab) and muscle spasms (Baclofen), and referred Gonzalez for a cervical MRI. Id.

Eleven days later, on December 14, 2012, Gonzalez attended her first physical therapy appointment where she was evaluated and prescribed therapy sessions two to three times a week. Ex. 33, MAGNOLIA_0009. Nonetheless, Gonzalez waited a week before returning for a second physical therapy appointment, on December 21, 2012, and did not return again until January 11, 2013. Gonzalez attended therapy only twice more, on February 25, 2013, and March 4, 2013, and then stopped going entirely. Id., MAGNOLIA_0004–0008. Notably, in her follow-up appointments with Emas, he consistently instructed her to continue with physical therapy. Based on his records and testimony, it appears that Emas was unaware that Gonzalez was not participating in physical therapy as prescribed.

On December 26, 2012, Gonzalez underwent a cervical MRI and returned to Emas' office. The report on the MRI documented "minimal cervical spondylosis" and a "left C5-C6 tiny paracentral disc herniation." Ex. 26, EMAS_0021. Gonzalez reported that she was taking Baclofen but had lost the prescription for Lortab. Id., EMAS_0026. According to the medical records, Gonzalez was continuing to experience pain in her neck, back, hands and thigh, and she reported for the first time the presence of pain in her left shoulder, documented as "reinjury." Id. Although she was experiencing muscle spasms in her back, she declined trigger point injections at that time. She was prescribed Tramadol for pain and instructed to continue with her medications and physical therapy. Due to her shoulder pain, she was advised to obtain an MRI of her left shoulder and referred to an orthopedic specialist for an evaluation. In addition, she was sent for a nerve conduction study of her arms to look for any impingement on the nerve roots in her neck.

In early January, Gonzalez underwent the MRI of her left shoulder and nerve conduction study. The nerve conduction study showed evidence of mild carpal tunnel syndrome, id., EMAS_0023, and the report on the left shoulder MRI indicated "mild tendonopathy of the rotator cuff" and a "mild degenerative change" in the joints with "no significant impingement." Id., EMAS_0022. Based on these studies, as well as the cervical MRI, Emas updated Gonzalez's diagnosis on March 11, 2013, to include: a paracentral cervical disc protrusion at C5-C6, bilateral posterior cervical paraspinal and trapezius myofascial injuries, thoracic and periscapular sprain, lumbosacral myofascial injuries, left lumbosacral sacroiliitis, bilateral shoulder contusions, and bilateral carpal tunnel syndrome. Id., EMAS_0021-0023, 0045. Emas identified all of these diagnoses as "post-traumatic," and "secondary to the motor vehicle accident on 11/29/12." Id., EMAS_0045.

## ii. Treatment of Spine

Initially, Emas' treatment plan for Gonzalez's neck and back pain involved anti-spasmodic and pain medications, as well as physical therapy.  On March 11, 2013, Emas began administering trigger point injections in Gonzalez's back in an effort to "reduce the pain and spasm [she] has in her injured muscles and improve her lumbosacral range of motion."  Id., EMAS_0045.  Emas also placed a trigger point injection in Gonzalez's left sacroiliac joint to reduce "inflammation and pain."  Id.  Due to the severity and persistence of her pain, Emas also discussed with Gonzalez more invasive pain management options, such as steroid injection therapy.  Although Emas instructed Gonzalez to continue with physical therapy, she had last attended therapy on March 4, 2013, and did not return.  Id., EMAS_0045; Ex. 33, MAGNOLIA_0010-0012.  After she canceled an appointment with Emas on April 1st, and failed to show up for her appointment on April 4th, Ex. 26, EMAS_0043-0044, Gonzalez next saw Emas on April 9, 2013.  At this visit, she reported that the trigger point injections had been helpful, and received additional trigger point injections in her thoracic paraspinous muscles.  Id., EMAS_0039.  However, given the severity and persistence of Gonzalez's reported pain, Emas determined that she may need more invasive treatment, and after discussing the matter with her, Emas referred Gonzalez for more extensive pain management care.  Specifically, Emas referred Gonzalez to Paul Baxt, M.D., an orthopedic surgeon at Integrated Surgical.

On May 2, 2013, Gonzalez had a consultation with Baxt who evaluated Gonzalez for possible epidural steroids.  Baxt referred Gonzalez for an MRI of her lumbar spine to determine the cause of her low back pain and recommended a cervical epidural steroid injection to treat her neck pain.  Baxt gave Gonzalez the injection at that visit, but when

she returned to Baxt on July 23, 2013, Gonzalez reported that the injection had not alleviated her pain. Ex. 31, INTSUR_0186, 0184. On Baxt's referral, Gonzalez obtained the first post-accident MRI of her lumbar spine on August 5, 2013, over eight months after the accident. Id., INTSUR_0183. The impression from this MRI report reads: "[a]t the L5-S1 level, there is 3-4 mm right paracentral and lateral herniation with mild to moderate effacement of the entrance to the right neural foramen." Ex. 26, EMAS_0020. On August 13, 2013, Gonzalez met with Samuel Hess, M.D., an orthopedic surgeon doing consulting work with Integrated Surgical, to whom she was referred by Baxt. At this appointment, Hess recommended that Gonzalez undergo low back surgery due to: her ongoing complaints of back pain radiating into her left leg, an MRI revealing a herniated disc at L5-S1, and the failure of all other interventions, including "injections, physical therapy, medication, and the tincture of time." Ex. 31, INTSUR_0181-0182. Notably, Hess testified that he reviewed Gonzalez's medical records from Baxt, but does not recall seeing any other medical records. Baxt's medical records indicate that Gonzalez "has been treated extensively with physical therapy and other conservative forms of treatment" but "has not responded," and noted on July 23, 2013, that Gonzalez "has been discharged apparently by the other treating medical personnel." Id., INTSUR_0186, 0184.

However, as is evident from the foregoing, these statements in Baxt's medical records are inaccurate. Contrary to the instruction of her physical therapist, Gonzalez had attended physical therapy only five times, including the evaluation, and despite Emas' direction that she continue with physical therapy, she had not attended therapy since March 4, 2013. In addition, Gonzalez had received trigger point injections on only two occasions—March 11, 2013, in her lumbosacral spine and left sacroiliac joint region, and

April 9, 2013, in her left thoracic paraspinous muscles—and had reported to Emas that the injections were helpful. She had received only one cervical epidural injection, although she reported to Baxt that it was not helpful, and no epidural injections in her lumbar spine. Moreover, Gonzalez had not been discharged by Emas, but had seen him as recently as June 28, 2013. Notably, Gonzalez canceled an August 28, 2013 appointment with Emas, which would have taken place after her consult with Hess about surgery, but prior to the surgery. Ex. 26, EMAS_0035. As such, Gonzalez did not discuss her decision to have back surgery with Emas, her neurologist, nor did Hess consult with Emas prior to the surgery. At trial, Emas testified that he had not considered her to be a candidate for back surgery at the time.

On September 18, 2013, Hess performed a lumbar laminectomy and discectomy on Gonzalez's back to address the herniated disc at L5-S1. Ex. 31, INTSUR_0148-0149. During the surgery, Hess observed an annular tear and removed loose fragments of the herniated disc. Id., INTSUR_0014. Following surgery, Gonzalez attended only four physical therapy sessions, despite a prescription for physical therapy three times a week for four weeks. Id., INTSUR_0136-0137, 0145. Gonzalez did not see Hess again until December 11, 2013, at which time she reported a recurrence of her pain following her participation in Thanksgiving Day preparation and cooking activities. Id., INSTUR_0026. As such, Hess ordered an MRI of her lumbar spine which showed the presence of scar tissue. Ex. 26, EMAS_0018. Hess reviewed this MRI with Gonzalez at her next appointment on February 11, 2014, and recommended that she continue to give her lower back time to heal. Ex. 31, INTSUR_0027-28. Due to her cervical neck pain, Hess referred her to pain management involving medial branch blocks and possibly radiofrequency

ablation.  Id.  Gonzalez's last appointment with Hess occurred on May 21, 2014, at which time he recommended continued pain management therapies including cervical facet injections, radiofrequency ablation, epidural steroid injections, and prescription pain medication.  Id., INTSUR_0029.

On May 8, 2014, Gonzalez had an interventional physiatric consultation with Gerald Nickerson, M.D., of Interventional Pain Solutions.  He treated Gonzalez for cervical facet syndrome, and over the following months she underwent several pain management procedures such as medial branch blocks, cervical radiofrequency ablations, and a transforaminal epidural steroid injection.  Id., INTSUR_0005-11.  On September 23, 2014, Gonzalez had a neurosurgery consult with Raul Rodas, D.O., of Integrated Surgical, who recommended continued conservative pain management and exploration of her candidacy for an epidural stimulator, but found no need for further neurosurgical intervention.  Id., INTSUR_0202.  During this time, Gonzalez continued receiving trigger point injections from Emas every few months.  Ex. 26, EMAS_0031, 0015, 0011, 0006, 0004, 0068, 0187, 0182, 0174, 0213.

Because Gonzalez's low back pain continued, on January 6, 2015, Emas referred her to Christopher Roberts, M.D. of the Jacksonville Spine Center for more invasive steroid injection therapy.  Gonzalez began seeing Roberts on February 5, 2015.  Ex. 32, JSC_0016-0018.  Roberts determined that scar tissue pressing on a nerve following the surgery was the cause of Gonzalez's low back pain.  After trying a series of epidural injections with no long-term relief, Roberts recommended that Gonzalez have a spinal cord stimulator implanted.  After a successful trial period with a spinal cord stimulator, Gonzalez underwent a second back surgery on November 13, 2015, during which Claudio Vincenty,

M.D., on Roberts' recommendation, implanted a spinal cord stimulator in Gonzalez's back to help alleviate her ongoing low back pain.  Id., JSC_0107.  Since that time, Gonzalez has continued receiving trigger point injections from Emas and epidural injections from Roberts to treat the pain in her cervical spine.  Recent MRIs of Gonzalez's cervical and lumbar spine show additional disc protrusions.  Roberts testified that these protrusions are either discs that were damaged in the accident but were not significant enough to be visible until some time had passed, or they are new herniations that have developed due to the abnormal gait with which Gonzalez walks as a result of her back problems.

### iii.  Treatment of Shoulder[6]

Gonzalez first complained of shoulder pain to Emas when she saw him for the second time, on December 26, 2012, almost a month after the accident.  Ex. 26, EMAS_0024.  As stated above, Emas sent Gonzalez for an MRI of her left shoulder and referred her to an orthopedic specialist, Ted Northrup, D.O., for treatment.  At Gonzalez's first appointment with Northrup, on January 28, 2013, his assessment was that she had a "sprain of the levator scapulae and rhomboids of the left shoulder."  Ex. 30, FSMI_0012-13.  Because Gonzalez was already in physical therapy for her back, Northrup recommended that Gonzalez continue with physical therapy and add treatment for her shoulder.  Gonzalez attended physical therapy only twice after her appointment with Northrup.  Although Northrup instructed her to follow up in three weeks, she did not return to Northrup until July 22, 2013.  At that appointment, Northrup noted that Gonzalez "did go through physical therapy without any significant long-term improvement."  Id., FSMI_0009.

---

[6] Although there was some discussion at trial regarding an injury to Gonzalez's left knee, Gonzalez is not seeking damages for that injury, see Tr. vol. 3 at 217, and she presented no evidence to support a finding that her knee pain was caused by the accident.

Northrup and Gonzalez agreed that she had reached maximum medical improvement, and Gonzalez has not returned to Northrup for any additional shoulder treatment.

### iv.  Treatment of Hands

Due to the numbness in Gonzalez's hands, Emas ordered a nerve conduction study on January 14, 2013.[7]  The study did not show any evidence of nerve root impingement in her cervical spine.  Rather, the study found evidence of a problem with the nerves in her wrists and as such, Emas diagnosed her with bilateral carpal tunnel syndrome.  Ex. 26, EMAS_0023.  At the March 11, 2013 appointment, Emas encouraged Gonzalez to use bilateral carpal tunnel wrist splints during the evening hours to treat the carpal tunnel syndrome.  Id., EMAS_0045.  Emas testified that anti-inflammatory medication is also used to treat carpal tunnel, but Gonzalez is unable to take those medications.  Thus, aside from the wrist splints, Gonzalez has not received any other treatment specifically for carpal tunnel syndrome, although the cervical epidural injections she is receiving from Roberts have reportedly helped with her hand numbness.

## II.  Conclusions of Law

### A.    Applicable Law

The evidence is undisputed, and it is not contested, that Santiago is at fault for the November 29, 2012 accident.  Rather, the central issue in this case is whether, and to what extent, Gonzalez's symptoms and conditions were caused by the accident.  "In negligence actions Florida courts follow the more likely than not standard of causation and require proof that the negligence probably caused the plaintiff's injury."  See Gooding v. Univ.

---

[7] Notably, according to Emas' medical records, Gonzalez did not report any swelling in her hands until her appointment on January 25, 2013.  Ex. 26, EMAS_0050.

Hosp. Bldg., Inc., 445 So. 2d 1015, 1018 (Fla. 1984).  In Gooding, the Florida Supreme

Court explained the burden of proof as follows:

> "On the issue of the fact of causation, as on other issues essential to his cause of action for negligence, the plaintiff, in general, has the burden of proof. He must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a substantial factor in bringing about the result. A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant."

Id. (quoting Prosser, Law of Torts § 41 (4th Ed. 1971)).  However, negligence need not be

the only cause of Gonzalez's injuries.  Rather, "[n]egligence may be a legal cause of . . .

injury . . . even though it operates in combination with . . . some natural cause . . . if the

negligence contributes substantially to producing such . . . injury."  See Fla. Std. Jury Instr.

(Civil) 401.12(b).  Moreover, where a negligent act caused a bodily injury that resulted in

an aggravation of an existing disease or physical defect, Florida law instructs the fact-finder

to "attempt to decide what portion of [the plaintiff's] condition resulted from the aggravation

. . . ."  See Fla. Std. Jury Instr. (Civil) 501.5(a).  If the fact-finder is unable to make that

determination, "or if it cannot be said that the condition would have existed apart from the

injury," then Florida law directs the fact-finder to "award damages for the entire condition

suffered by [the plaintiff.]"  Id.

Here the parties present competing expert opinions on the cause of Gonzalez's

ailments.  As the fact-finder, the Court "is free to determine the reliability and credibility of

expert opinions and, if conflicting, to weigh them as the finder sees fit."  See Dep't of Ag. &

Consumer Servs. v. Bogorff, 35 So. 3d 84, 88 (Fla. 4th Dist. Ct. App. 2010); see also Fla.

Std. Jury Instr. (Civ.) 601.2b ("You may accept such [expert] opinion testimony, reject it, or

give it the weight you think it deserves, considering the knowledge, skill, experience,

17

training, or education of the witness, the reasons given by the witness for the opinion expressed, and all the other evidence in the case."). A fact-finder's decision to reject expert testimony "must be founded on some reasonable basis in the evidence." See Boyles v. A&G Concrete Pools, Inc., 149 So. 3d 39, 48 (Fla. 4th Dist. Ct. App. 2014). Such a basis for rejecting expert testimony can include, for example:

> conflicting medical evidence; evidence that impeaches the credibility or basis for an expert's opinion; the lack of candor of the plaintiff in disclosing prior accidents, prior medical treatment, and prior or subsequent similar injuries; conflicting lay testimony or evidence that disputes the injury claim; or the plaintiff's overall credibility relating to conflicting statements regarding the alleged injury.

Id.; see also Easkold v. Rhodes, 614 So. 2d 495, 498 (Fla. 1993) (finding jury could properly reject the expert testimony of plaintiff's doctors where jury also heard evidence that plaintiff did not accurately report her previous medical history to the doctors).

### B.    Expert Opinions on Causation

Gonzalez maintains that she sustained permanent injuries to her neck, back, and wrists in the accident, as well as an injury to her shoulder. Gonzalez contends that as a result of these injuries she is suffering from chronic neck and back pain, necessitating two back surgeries and ongoing pain management therapies, as well as carpal tunnel syndrome. Because of these injuries, Gonzalez asserts that she is no longer able to perform household activities such as cooking and cleaning to the same extent as before the accident. In addition, Gonzalez maintains that these injuries prevent her from working.[8] As evidence of causation, Gonzalez presented the expert opinions of three of her treating physicians: Emas, Roberts, and Hess. In opposition, the government offered the testimony

---

[8] As previously noted, Gonzalez asserted that injuries from the accident caused her to be terminated from her employment with Allstate. However, the Court has rejected that assertion.

of three experts: a radiologist, a neurosurgeon, and an orthopedic surgeon.  Faced with these competing expert opinions, the Court will first summarize their testimony on causation, and then make its conclusions as to causation.

### i. Dr. Emas

Emas opined that, based on his examination of Gonzalez and her medical history, Gonzalez's neck, back, shoulder, and wrist conditions are all related to the November 29, 2012 car accident.  Emas explained that Gonzalez's symptoms, specifically, the tenderness and pain to the touch throughout her spine, were consistent with trauma, and that the on-set of these symptoms following the accident indicate that the accident was the cause of the injuries.  Significantly, Emas relied on Gonzalez's rendition of her medical history and her representations that these symptoms began only after the accident.  Emas did not review any of Gonzalez's prior medical records.  However, Emas did rule out infection or genetic factors as potential causes of Gonzalez's symptoms.

Specifically as to Gonzalez's cervical spine, Emas opined that because the cervical spine MRI did not show any significant aging changes, the presence of a disc herniation was unusual, indicating to him that the herniation was due to trauma.  In addition, Emas explained that discs calcify as they heal after a herniation, and the absence of calcification indicated that the herniation occurred recently.  Likewise, if the herniation had occurred earlier, Emas testified that he would have expected to see more changes around the disc as surrounding abnormalities would develop over time.  However, Emas did not examine the actual MRI of Gonzalez's cervical spine after the accident, and drew his conclusions based on the radiologist's report.

With respect to Gonzalez's wrist condition, Emas opined that her carpal tunnel syndrome is also attributable to the accident as a result of Gonzalez bracing herself against the dashboard with her hands. Emas' causation opinion is premised entirely on his understanding that Gonzalez did not experience any hand pain or other symptoms suggestive of carpal tunnel before the accident. Although Emas did not observe any signs of swelling at Gonzalez's initial visit, he explained that he would not necessarily expect to see swelling in these circumstances.

### ii. Dr. Roberts

Roberts also opined that the car accident is the cause of Gonzalez's "current painful conditions." See Tr. vol. 2 at 162. Roberts' opinion is likewise based on his understanding of when Gonzalez began experiencing symptoms. Roberts explained that Gonzalez's lack of a need for treatment prior to the accident, and persistent complaints of pain following the accident indicate that Gonzalez's current problems were caused by the accident. Specifically, Roberts stated that, in his medical experience, the absence of any problems beforehand, and the temporal proximity between the accident and Gonzalez's onset of problems, demonstrate that the accident was the cause of Gonzalez's neck and back pain. However, Roberts' understanding that Gonzalez did not experience these issues before the accident is premised entirely on Gonzalez's statements to him, and her medical records from Emas. Roberts did not review any of Gonzalez's medical records from before the November 29, 2012 accident. Although Roberts testified that the mechanism of Gonzalez's injury was relevant to his treatment, his testimony regarding how he formulated that opinion is revealing:

> I thought she had problems after the accident, so—I formulated [an] opinion. I don't—it's like she's been in the accident, she's still hurting and I'm trying

to fix that.  So I guess I'm treating everything from the accident.  That would be the opinion, yeah.  I don't know if I ever formulated other than it just— she's been in an accident, she's hurting, and I've been treating her for that.

See Tr. vol. 2 at 161.  Indeed, the record of Gonzalez's initial visit with Roberts, on February 5, 2015, states that: "This condition is injury related.  Onset was year(s) ago (11/29/12).  The injury occurred year(s) ago during a motor vehicle accident."  Ex. 32, JSC_0016.  Thus, it is unclear what analysis, if any, Roberts undertook to determine the initial cause of Gonzalez's pain.  Roberts testified that he did not consider any other potential causes of Gonzalez's pain.

### iii.  Dr. Hess

Hess opined that the November 29, 2012 accident caused a herniation in both Gonzalez's lumbar and cervical spine, resulting in Gonzalez's symptoms of pain.  Hess's opinion is largely based on Gonzalez's history and his understanding that "she was doing fine before without any limitations in her ability to function with respect to her cervical or lumbar spine, upper or lower extremities."  See Deposition of Samuel Hess, M.D. (Doc. 56-3) at 37.  Because of this, Hess "felt that it was very reasonable to assume that the accident was the reason she was coming to [him] and complaining of the things she was complaining of."  Id.  Hess reached this opinion without reviewing any of Gonzalez's medical records from before the accident.  Id. at 88, 90.  Hess further explained that the November 29, 2012 accident that Gonzalez described in her history "was consistent with one that could cause a herniation in the lumbar spine and cervical spine."  Id. at 35.  In addition, Hess opined that Gonzalez exhibited no signs of significant age-related changes to her spine or evidence of a disease process in her spine that would have otherwise caused her to need

surgery. Id. at 68.  Hess also testified that when he conducted the surgery he observed an annular tear, and that such tears are caused by traumatic injury.  Id. at 40.

### iv.  Dr. Kaye

The United States offered the testimony of radiologist Marc D. Kaye, M.D.  Having reviewed Gonzalez's medical records, dating before and after the accident, including X-rays, CT scans, and MRIs, Kaye determined that Gonzalez suffers from long-standing degenerative disc disease in her cervical, thoracic and lumbar spine, as well as degenerative tendonopathy in her left shoulder.  In the December 2012 and January 2013 MRIs of Gonzalez's cervical spine and left shoulder, Kaye found no evidence of soft-tissue damage or acute injury, such as swelling, blood, or ligament tears.  Rather, Kaye observed changes in Gonzalez's spine and shoulder indicative of long-term chronic conditions that pre-existed the accident.

For example, in Gonzalez's cervical spine, Kaye observed desiccation in some of the discs, as well as disc bulges at several levels and disc osteophyte complexes.  Kaye explained that these changes are not due to acute trauma but are the result of long-standing degeneration and desiccation of the disc.  Notably, Kaye testified to his opinion that the conditions present in Gonzalez's cervical and lumbar spine are disc bulges, not herniations, and that those bulges were present before the accident.  Likewise, Kaye opined that Gonzalez's lumbar and thoracic spine also showed signs of degenerative, chronic changes, and Kaye found no evidence of injury due to trauma.  Significantly, Kaye testified that these pre-existing conditions did not make Gonzalez more susceptible to injury in the accident.  As such, Kaye testified that the November 29, 2012 accident was not the cause of the disc bulge or protrusion at C5-C6 or the disc bulge at L5-S1, did not

cause any other injuries to her spine, and did not exacerbate her pre-existing degenerative condition.  In contrast to Hess, Kaye opined that an annular tear, what Kaye referred to as an annular fissure, is part of the spectrum of degenerative disc disease and not evidence of trauma.  Kaye further testified that Gonzalez's shoulder condition is not attributable to the November 29, 2012 accident as it is not a traumatic injury but rather a chronic degenerative inflammatory process.

Of significance to the Court was the fact that Kaye supported his opinions in part by reviewing X-rays, and CT scans taken before the accident which showed Gonzalez's cervical and lumbar spine.  Although these pre-accident images were obtained to examine other parts of her body, and not to treat neck or back pain, because Gonzalez's neck and spine where visible in the images, Kaye was able to make a comparison of Gonzalez's pre- and post-accident spine.  With respect to Gonzalez's cervical spine, Kaye examined an X-ray of her cervical spine from 2004 and noted the presence of bony spurs, called osteophytes, at the C5-C6 level.   He explained that osteophytes are evidence of degenerative disc disease.  In addition, Kaye opined that signs of a degenerative condition, including disc osteophyte complexes and a mild degree of retrolisthesis, are present in a CT scan taken over two years before the accident.  Indeed, when comparing this March 23, 2010 CT scan,[9] with the 2016 CT scan of Gonzalez's cervical spine, Kaye testified that her spine "looks pretty much the same."   See Tr. vol. 4 at 31.  Likewise, in a July 2, 2010 CT scan showing Gonzalez's lumbar spine,[10] Kaye observed chronic changes in the spine,

_____

[9] The 2010 CT scan shows Gonzalez's neck and was performed at the time to examine her trachea, vocal chords or larynx due to her complaints of hoarseness.

[10] This 2010 CT scan was of her abdomen and pelvis, and was ordered due to Gonzalez's complaints of rectal bleeding and abdominal pain.

including a disc bulge at L5-S1, and mild retrolisthesis.  In the August 2013 MRI of Gonzalez's lumbar spine, Kaye found chronic disc degeneration, including desiccation, disc bulging, and retrolisthesis and based on the degree of desiccation at L5-S1, opined that the condition had existed, at a minimum, for over a year.  When Kaye compared these images, he found that the L5-S1 disc bulge was present in 2010 and had not changed much between the two scans.  Kaye also compared a June 18, 2012 X-ray of Gonzalez's chest, which showed her thoracic spine, with a July 19, 2015 MRI of Gonzalez's thoracic spine and found evidence of chronic changes, specifically, mild degenerative disc disease with mild disc bulging in the thoracic spine.  Kaye saw no evidence of injury or previous trauma.

### v.  Dr. Wirth

Next, the United States called Fremont P. Wirth, M.D., a neurosurgeon.  Wirth also opined that Gonzalez did not suffer any permanent injuries as a result of the November 29, 2012 accident.  Wirth reviewed Gonzalez's full medical record and testified that Gonzalez had a "well-documented history" of neck and low back pain prior to the accident.  Wirth discussed Emas' diagnoses from Gonzalez's first visit and explained that the myofascial injuries listed are stretching or bruising injuries to muscles or ligaments which would cause immediate pain, and would resolve completely with proper care, i.e., physical therapy, rest and medication.  Wirth also opined that Gonzalez's diagnosis of left sacroiliitis is an inflammation and bruising of the joint which is not permanent and should heal.  As to Gonzalez's carpal tunnel diagnosis, Wirth opined that it is rare to develop carpal tunnel from trauma without a significant wrist injury causing fracture and swelling.  Absent any sign that Gonzalez sustained a wrist injury at the time of the accident, such as evidence of

significant swelling in her wrists, Wirth determined that the car accident is not the most likely cause of Gonzalez's carpal tunnel syndrome.

Wirth also testified that it was unlikely the herniation in Gonzalez's cervical spine was caused by the accident because a herniation due to trauma would have caused immediate pain, and there is no evidence that Gonzalez complained of neck pain at the time of the accident. In addition, Wirth stated that he would not expect someone complaining of lumbar spine pain to have undergone treatment for almost nine months after the accident before any imaging was done on her lumbar spine. Wirth also found a significant discrepancy between Gonzalez's complaints of pain radiating down her <u>left</u> leg as a result of the accident, and the back surgery which addressed a small herniated disc on her <u>right</u> side. Wirth testified that absent a very large herniation, a person should feel pain on the same side as the herniation.[11] In addition, Wirth explained that while trauma can cause an annular fissure, it is more likely the result of a degenerative process of the annulus. Wirth examined the post-accident MRIs of Gonzalez's cervical and lumbar spine and testified that both images showed degenerative changes in her spine.

### vi. Dr. Von Thron

The government's last medical expert was M. John Von Thron, M.D., an orthopedic surgeon. Von Thron based his opinions on his April 29, 2015 independent medical examination of Gonzalez, and his review of Gonzalez's pre- and post-accident medical records. Von Thron opined that Gonzalez did not suffer any permanent injuries as a result of the accident, nor did she suffer any aggravation to a pre-existing condition in the

---

[11] Notably, six months before the accident, on June 18, 2012, Gonzalez reported to Memorial Hospital complaining of lower back pain radiating to her right hip. According to the medical records, at that time she informed the staff that she had a bulging disc at L-4. Ex. 36, MEMORIAL_0147.

accident.   Von Thron's opinion is largely based on the pre-accident complaints of pain documented in Gonzalez's medical records, the lack of any evidence that Gonzalez felt pain at the time of the accident, and the degenerative changes present in her spine. Likewise, Von Thron explained that the disc bulges or herniations in Gonzalez's spine were not caused by the accident because if Gonzalez had experienced a herniation due to trauma, she would have felt pain immediately.   Von Thron noted that Gonzalez's doctors did not obtain an MRI of Gonzalez's lumbar spine until nine months after the accident, indicating to Von Thron that Gonzalez had not initially complained of serious pain in her lumbar spine.   In addition, Von Thron opined that Gonzalez's failure to consistently attend physical therapy in the weeks immediately following the accident is unusual for someone suffering from a severe injury.   Von Thron also observed that after the accident Gonzalez did not complain about neck and back pain to her primary care physician, Elyssa Blissenbach, M.D.  Von Thron's assessment is that Gonzalez suffered from non-permanent muscle injuries following the accident, such as strains or sprains, which should have resolved within six to twelve weeks.

With respect to Gonzalez's shoulder complaints, Von Thron opined that Gonzalez did not permanently injure her left shoulder in the accident, and there is no evidence to suggest that Gonzalez's left shoulder problems were caused by or exacerbated in the November 29, 2012 accident.   Likewise, consistent with Wirth's opinions, Von Thron testified that it is rare to see carpal tunnel develop from trauma, and that to do so, it usually requires a major injury to the wrist involving some fracture or deformity.   However, Von Thron observed that carpal tunnel is a very common condition in persons who are

overweight. As such, Von Thron testified to his opinion that Gonzalez's carpal tunnel syndrome was not caused in, or aggravated by, the accident.

### C. Causation Findings

#### i. Spine

Turning first to Gonzalez's neck and back problems, upon careful consideration of the testimony of the lay witnesses, the medical testimony, the Court's independent review of the medical records, and all other relevant evidence, the Court accepts the testimony of Wirth, Von Thron, and Kaye that Gonzalez has degenerative disc disease, which pre-existed the accident. The Court found Kaye's testimony to be particularly compelling as he was the only witness who compared all of the available objective images of Gonzalez's neck and back from both before and after the accident. Upon review of these imaging studies, including X-rays, CT scans, and MRIs, Kaye demonstrated that Gonzalez's spine showed changes indicating degenerative disc disease as far back as 2004. Kaye determined that the conditions in Gonzalez's spine were chronic, and he found no evidence to suggest that these conditions were exacerbated by the accident. Kaye explained that he saw no signs of acute trauma to her spine. Indeed, in his comparison of the imaging studies he found no sign that the condition of her neck and back had changed. Moreover, the Court is persuaded by the testimony of Wirth and Von Thron that had Gonzalez sustained the neck and back herniations at the time of the accident, she would have felt pain from a traumatic herniation immediately. Based on this testimony, the Court finds it more likely than not that Gonzalez had degenerative disc disease in her spine well before the accident, and that the herniations or bulges in Gonzalez's cervical and lumbar spine were not caused by the accident. To the extent Emas, Roberts, and Hess testified to the

contrary, the Court is not persuaded by their analyses because they did not review Gonzalez's prior medical records and relied heavily on Gonzalez's accounts of her medical history, which as discussed below, the medical records established were terribly inaccurate, to draw their conclusions.

Nevertheless, Kaye acknowledged that the presence of the chronic degenerative changes in Gonzalez's spine does not necessarily mean that she was experiencing symptoms of this condition prior to the accident. Indeed, Kaye explained that degenerative disc disease can cause symptoms or be asymptomatic, and that he was not commenting on whether Gonzalez experienced symptoms or pain following the accident. Gonzalez contends that even if the degenerative conditions were long-standing, the accident aggravated her pre-existing condition and precipitated the onset of her current painful symptoms and need for treatment. Indeed, counsel for Gonzalez emphasized that even if Gonzalez had experienced some neck and back pain prior to the accident, she had not sought any consistent treatment for those conditions, whereas after the accident Gonzalez has continuously pursued treatment for neck and back pain. As such, the Court next considers whether Gonzalez has established that the accident aggravated her pre-existing spine condition such that it is the cause of the pain which has necessitated her subsequent surgeries and extensive pain management treatment.

To make this determination, the Court again has considered Gonzalez's medical records and evidence, the expert testimony, and the testimony of Gonzalez's friends and family members regarding her condition before and after the accident. As observed by Wirth, Von Thron, and Kaye, the Court finds documentation throughout Gonzalez's medical records that Gonzalez was experiencing similar symptoms of neck and back pain, including

complaints of radiating low back pain as recent to the accident as June of 2012. Although Gonzalez's prior medical records are compelling evidence of her longstanding problems with neck and low back pain, Gonzalez nonetheless maintains that despite these records, she was not experiencing chronic pain in her neck and back prior to the accident. Gonzalez dismisses the documentation of pain in her medical records as attributable to isolated incidents involving urinary tract infections (UTI), bronchitis, or short-term injuries. In support of her contention that her chronic neck and back pain began only after the accident, Gonzalez offered the testimony of her daughter, husband, daughter-in-law, and fellow church-member, who described the changes they observed in Gonzalez after the accident. Upon careful consideration of this testimony and review of all the evidence, the Court does not doubt that Gonzalez's life has changed greatly in the years following the accident, and that Gonzalez is experiencing chronic pain. Nonetheless, for the reasons that follow, the Court rejects Gonzalez's contention that the accident precipitated the onset of more severe or persistent pain than that which she had prior to the accident.

First, despite Gonzalez's assertions to the contrary, the medical records prior to the accident document a history of chronic neck and back pain. The records indicate long-standing pain, of a similar nature, which cannot be dismissed as a mere temporary aggravation due to an isolated injury, a urinary tract infection, or cough. The descriptions of the pain in these records are consistent with the pain for which Gonzalez sought treatment following the accident, and the imaging of Gonzalez's spine prior to the accident indicate long-term degenerative changes. Although the Court will not attempt to recount all the places in Gonzalez's medical records where she complained of neck, back and shoulder pain, a few salient examples are worth highlighting:

- On June 18, 2012, Gonzalez reported to the emergency room at Memorial Hospital complaining of right lower back pain radiating to her side, and a cough. Ex. 36, Memorial_0151. The records indicate that her chief complaint at the time was back pain. Significantly, according to these records, Gonzalez denied any injury but informed the staff that she "has a bulging dis[c] at L4," and had experienced similar symptoms several years ago. Id., Memorial_0147. The records reflect a "past history" of "Arthritis (in the neck s/p MVA several years ago). Has had back injury." Id. Notably, the emergency room doctor ordered an X-ray of her lumbar spine due to her reports of right lower back pain that radiates to the side.[12] Id., Memorial_0162. The report on this X-ray lists the following impressions: "Minimal endplate spurring. Mild loss of disc height L5-S1 consistent degenerative disc disease." Id. The discharge instructions, which Gonzalez signed, noted that she was given information on degenerative disc disease at this visit. Yet, Gonzalez testified that she had never heard the word "degenerative" and no one discussed it with her during her June 18, 2012 trip to the emergency room. Notably, Gonzalez did not tell Emas about this emergency room visit or that she had recently had an X-ray of her lumbar spine due to radiating low back pain.

- In May 2008, Gonzalez complained to medical providers at Baptist Primary Care of neck pain and shoulder pain. Ex. 22, BPC_0021. As a result, she obtained

---

[12] Although Gonzalez attempts to attribute the back pain she reported on this visit as being solely related to her cough, the Court found Von Thron's testimony persuasive that the emergency room doctor would not have ordered an X-ray of Gonzalez's lumbar spine if the doctor felt the pain was solely related to the cough. Von Thron further explained that although coughing can cause back pain, it generally does not cause pain that radiates into one's legs.

X-rays of both shoulders and her cervical spine. In the radiologist's report, the findings note degenerative changes, and a "loss of lordosis" in Gonzalez's cervical spine. Id., BPC_0031. The Baptist providers referred Gonzalez to an orthopedic specialist for further evaluation. Id., BPC_0042.

- On June 11, 2006, Gonzalez went to the Emergency Department at Shands hospital with a chief complaint of "Back Pain 1 Week." Ex. 44, SHANDS_0010. She reported sharp back pain, with an intensity level of 10. Id., SHANDS_0012. According to the record of this visit, she reported low back pain, radiating to her left leg, and no injury or trauma. Id. Gonzalez left without obtaining any treatment because waiting was too difficult due to her back pain. Id., SHANDS_0013. At trial, Gonzalez attributed the pain she was experiencing on this visit to a cough, although that is not reflected in the medical records and appears inconsistent with her account of low back pain radiating to her leg.

- On January 28, 2005, Gonzalez was seen by an advanced registered nurse practitioner at Family Care Partners. Gonzalez's chief complaint was "low back pain" of a 9-10/10 severity level, with intermittent duration, and an onset of one year ago. Ex. 29, FCP_0003. She reported spasms, tenderness, tingling in her legs, and a decrease in mobility. According to this medical record, Gonzalez reported that she saw an orthopedic specialist for a "ripped tendon in shoulder blade," and had seen a physical therapist with no relief, although it is noted that she "didn't atten[d]." Id. The nurse reported the following based on her physical examination of Gonzalez at that visit:

> BACK/SPINE: Thoracic mobility decreased. Lumbar mobility decreased. Sciatic notch (right) is tender to palpation.

31

> Paravertebral muscle spasm. Positive for tenderness. Negative straight leg raising.
> MUSCULOSKELETAL: Cervical spine has muscle spasm, Thoracic spine has muscle spasm, Lumbar spine has muscle spasm.

Id., FCP_0004. Gonzalez also reported symptoms of a UTI on this visit, id., FCP_0003-0004, and at trial she attributed all of her complaints on this visit to the UTI.

- On June 4, 2004, Gonzalez complained of aching shoulder pain radiating to her left arm and neck to a doctor at Family Care Partners. Id., FCP_0022. She was sent for an X-ray of her cervical spine and left shoulder that same day, and the X-ray report notes: "nearly normal studies with mild degenerative changes in the cervical spine," specifically, a "loss of disc space height at the C4-C5 level." Id., FCP_0031. A few weeks later, on June 29, 2004, Gonzalez reported to Baptist Medical Center complaining of left shoulder pain and back pain. Ex. 20, BMC_0160. The medical records note this pain as "chronic pain for 1 yr." Id. Her "chief complaint" on this visit was a history of chronic neck and back pain. Id., BMC_0154. She reported that it was a chronic problem but she had awoken with increased pain. Id. She described the pain as sharp and radiating to her left arm. Id. The medical records also document tingling in her left arm, id., as well as muscle spasm in her neck. Id., BMC_0155. She was diagnosed with an acute left neck strain and radiculopathy, id., BMC_0153, and the doctor ordered a left arm sling, and cervical collar. Id., BMC_0153, 0164. Her discharge instructions included information on neck pain from a pinched nerve, and she was instructed to follow up in forty-eight hours and consider further testing. Id.,

BMC_0159, 0156.  She also called her primary care provider at Family Care Partners that day and reported that she had been seen in the emergency room for "shoulder pain numbness in left arm neck and back pain," and that she was in "horrible pain."  Ex. 29, FCP_0021.  She informed Family Care Partners that she was told she needs an MRI.  Id.  Gonzalez's medical records show that on July 3, 2004, she obtained an MRI of her cervical spine for a clinical history of "pain," and the MRI showed a "normal cervical spine."  Ex. 39A, Monument9A_0003.  At trial, Gonzalez attributed these reports of pain to an injury from moving furniture, but the Family Care Partners records indicate that the onset of the pain was two years ago, Ex. 29, FCP_0022, and according to the Baptist Medical Center records, she reported a prior neck and back injury from moving furniture two years earlier.  Ex. 20, BMC_0154.  Despite informing Emas of car accidents that occurred 19 and 23 years prior to her appointment, she failed to inform Emas of this trip to the emergency room from eight years earlier where she complained of radiating neck and back pain, was diagnosed with a neck strain and pinched nerve, and told to wear a cervical collar.

Where the medical records contradicted her testimony and the medical history she gave to her doctors, Gonzalez dismissed those records as inaccurate or erroneous.  The Court found the suggestion that all of these records are erroneous to be implausible, and thus, Gonzalez's refusal to acknowledge the reality of her documented medical history when testifying at trial only served to undermine her credibility on the witness stand.

Second, the objective evidence of Gonzalez's actions in the days and weeks following the accident are inconsistent with those of a person suffering from a traumatic

injury.  Gonzalez did not complain of any pain to anyone at the scene of the accident, including her daughter, employer, or the law enforcement officer, nor did Gonzalez obtain any medical treatment immediately after the accident, despite a history of regularly making trips to the emergency room when she was in pain, as is evident above.  Instead, Gonzalez contacted two lawyers about the accident and set up a doctor's appointment for a few days later.  Notably, the day after the accident Gonzalez spent several hours at the DMV, and the following Tuesday, Gonzalez drove the car to two different auto repair shops for estimates.

Gonzalez never told her employer that she had to miss work because of injuries from the accident, and she returned to work less than a week later.  She never informed her employer that she was unable to work due to pain or medical appointments from the accident.  Once she returned to work, she did not miss a scheduled work day until almost two months after the accident, on January 22, 2013.[13]  On that date, she called-in sick with pink eye.  Moreover, in the time period immediately following the accident, Gonzalez failed to attend physical therapy as prescribed.  The records show that Gonzalez only attended an initial evaluation and two physical therapy sessions in the first two months after the accident.  The Court finds Von Thron's assessment that this failure to attend therapy is inconsistent with someone who is experiencing severe pain from a traumatic injury to be persuasive.

Third, Gonzalez herself was not a credible witness.  Significantly, she conceded that she intentionally misled her employer about the reason she missed work on the Monday following the accident.  She also signed a document to submit to her insurance company

---

[13] Although during that time, she did have extensive leave over the holidays and moved to a part-time schedule.

which misrepresented the reason she was moved to a part-time schedule. Moreover, despite the facts summarized above, she testified at trial that she was terminated from her employment due to accident-related doctor's appointments. In addition, as noted above, although Gonzalez informed her doctors about two previous automobile accidents from decades before the subject accident, she was not forthcoming about any of the instances over the previous eight years where she sought treatment for severe and recurrent neck, back and shoulder pain, including symptoms of radiating pain and tingling. Even if Gonzalez believed her back and neck pain on those occasions were related to a cough or UTI, her failure to even mention any of her numerous emergency room visits, including one just six months prior, while remembering to disclose more distant "resolved" injuries from car accidents, appears deliberate. As the fact-finder, this lack of candor with her doctors is concerning to the Court. In addition, her demeanor during cross-examination undermined her credibility. Specifically, during direct, Gonzalez appeared to have a firm grasp on the events, but during cross-examination she was unable to recall answers to many questions, even on matters that she had previously discussed, or heard discussed, during trial. Likewise, Gonzalez's description of the accident was exaggerated and inconsistent with the pictures of the scene. For example, Gonzalez refused to concede that the pictures showed a relatively minor accident and insisted that the picture of the accident indicated a "severe" accident. Lastly, the Court finds Gonzalez's comparison of her pre- and post-accident activities and, in particular her "Post Op Journal," see Ex. 62, to be exaggerated, if not contrived. Thus, because Gonzalez lacks credibility, the Court is unable to give much weight to her own account of the onset and severity of her pain following the accident.

Turning to the testimony of her family members, upon careful consideration, the Court also finds this testimony to be of little persuasive value. These witnesses all have a vested interest in the outcome of the trial, as they are close, personal relatives of Gonzalez. Moreover, the Court heard very little testimony specific to Gonzalez's condition immediately preceding the accident, and her pain levels in the weeks and months that followed the accident, before she had surgery. Instead, these witnesses focused largely on Gonzalez's condition after her back surgery. In addition, to the extent these witnesses testified about Gonzalez's activities ten years before the accident, the Court found such testimony unhelpful in determining the impact the accident had on Gonzalez given the evidence of her significant weight gain, Ex. 45, SVMC_0013, in the years leading up to the accident.

In addition, Gonzalez called Marlene Thomas as a before and after witness who could testify to the change in Gonzalez. On the stand, Thomas was presented as merely an acquaintance of Gonzalez's from church, but after the conclusion of her testimony, the government discovered that this witness is also the mother of Gonzalez's attorney, John Thomas. Counsel for Gonzalez failed to inform the government or the Court of this relationship, and the information only came to light when the government later learned of it from a third-party. While the Court questions whether this failure to disclose violated counsel's duty of candor to the Court, regardless, as the fact-finder, the Court gives little weight to Thomas' testimony in the absence of any information by which to assess the influence this witness' close familial relation to counsel may have had on her testimony. Had counsel been forthcoming about the witness' connection to the case, such that both sides could have questioned the witness about any potential influence on her testimony, the witness might have been able to dispel any concerns of bias. As it stands, the Court

finds that the decision not to disclose the witness's close personal connection to the case undermines the credibility of her testimony to the extent that the Court as the fact-finder declines to give her testimony any significant weight.

Based on the foregoing, the Court finds that Gonzalez was experiencing chronic neck and back pain well before the accident. As such, the Court rejects the opinions of Gonzalez's expert witnesses that her current problems with neck and back pain were caused by the accident. All three of Gonzalez's physicians who testified at trial explained that their causation opinions were largely premised on their understanding that Gonzalez was not experiencing the same symptoms prior to the accident. However, Gonzalez failed to inform her treating physicians of her history with neck and back pain, and these doctors did not review Gonzalez's prior medical records. As such, a critical component of their causation opinion is premised on significantly inaccurate information. In contrast, Kaye, Wirth, and Von Thron reviewed Gonzalez's full medical history, both before and after the accident, and were therefore aware of her history of chronic pain. The Court gives greater weight to the causation testimony of the doctors who considered all of the information in Gonzalez's medical history, and premised their opinions on an accurate picture of Gonzalez's condition before the accident. See Boyles, 149 So. 3d at 49 ("[B]ecause the jury had a reasonable basis to conclude the plaintiff was not candid with his doctors, the jury had a reasonable basis to reject the doctors' opinions.").

In sum, the Court determines that the pathologies present in Gonzalez's spine, including the bulges or herniations in her cervical and lumbar spine, were not caused or exacerbated by the accident, but rather were present before the accident. The Court further finds that Gonzalez suffered from chronic neck and back pain before the accident,

and that Gonzalez has failed to establish by the greater weight of the evidence that the accident exacerbated this pre-existing condition. Because Gonzalez was not forthcoming with her treating physicians about the symptoms she had experienced prior to the accident, these doctors were unaware of that history and thus did not opine on whether, or to what extent, the accident exacerbated her pre-existing conditions. In contrast, Kaye testified that the condition of Gonzalez's spine did not make her more susceptible to injury in the car accident, and that there was no evidence that the car accident exacerbated her pre-existing degeneration. While Gonzalez makes much of the fact that her need for ongoing pain management treatment began only after the accident, the Court is not persuaded that the mere temporal proximity between the car accident and Gonzalez's decision to pursue more extensive treatment for her chronic pain shows causation. See Cooper v. Marten Transp., Ltd., 539 F. App'x 963, 967 (11th Cir. 2013); Greene v. Flewelling, 366 So. 2d 777, 781 (Fla. 2d Dist Ct. App. 1978). This is particularly true where, as here, a plaintiff suffers significant credibility challenges. Upon consideration of all the evidence, the Court agrees with Von Thron's assessment that: "she's had . . . bad back pain for many, many years, and now she gets in the accident and all of a sudden she has a lot of access to doctors who are trying to help her. So . . . [that's her] chance to get [her] back fixed, and she goes through with everything they say." See Tr. vol. 4 at 233. As such, Gonzalez has failed to persuade the Court that it is more likely than not that the accident caused a permanent injury to her spine or an aggravation of her degenerative disc disease.

However, the Court does find that Gonzalez suffered painful muscle strains as a result of the accident such that her initial visits to Emas were reasonable, as was his referral for a cervical MRI to diagnose the cause of her pain. See Plana v. Sainz, 990 So. 2d 554,

556 (Fla. 3d Dist. Ct. App. 2008) ("It is generally true that even when a jury finds that the plaintiff was not injured as a result of the subject accident, the plaintiff is entitled to recover those expenses incurred for medical examinations and diagnostic testing reasonably necessary to determine whether the subject accident caused the injuries.").[14]   The Court finds by a preponderance of the evidence that Emas' prescription for pain and anti-spasmodic medications as well as physical therapy were warranted to treat Gonzalez's pain from the accident as well.  Accordingly, the Court determines that, as a result of the accident, Gonzalez incurred the cost of the December 3, 2012, December 26, 2012, and January 25, 2013 visits to Dr. Emas, the December 26, 2012 cervical MRI, the five physical therapy sessions and the prescription medication during this time period.  Nonetheless, as of March 4, 2013, Gonzalez stopped attending physical therapy.  In addition, after her January 25, 2013 follow-up visit with Emas, Gonzalez waited over six weeks before returning to Emas on March 11, 2013.  Notably, Von Thron testified that the injuries Gonzalez suffered in the car accident are typically resolved within six to twelve weeks, i.e., by February 21, 2013, at the latest.  As such, the Court finds it more likely than not that after her final March 4, 2013 physical therapy session, Gonzalez's muscle strains from the accident had resolved, and the additional pain management treatment she pursued following that point was related to her long-standing chronic pain.

### ii. Shoulder

With respect to her shoulder, the Court finds that Gonzalez fails to establish by a preponderance of the evidence that the symptoms she experienced were related to the

---

[14] The Court acknowledges that there are exceptions to this general rule, see,e.g., Schwartz v. Wal-Mart Stores, Inc., 155 So. 3d 471, 473-74 (Fla. 5th Dist. Ct. App. 2015), but determines that despite Plaintiff's lack of complete candor, she did suffer from temporary painful strains which warranted the diagnostic testing.

accident. Notably, Gonzalez did not mention any shoulder pain to Emas on her initial December 3, 2012 visit, nor did she mention shoulder pain during her physical therapy appointments on December 14 and 21, 2012. The first notation of shoulder pain in Gonzalez's post-accident medical records is found at the December 26, 2012 appointment with Emas, nearly a month after the accident. Gonzalez did not see a specialist for her shoulder, Northrup, until January 28, 2013. Northrup's records do not reflect whether he determined if the accident was the cause of Gonzalez's pain and he did not testify at trial. Kaye testified that the MRI of Gonzalez's shoulder showed signs of chronic inflammation, and no signs of injury from trauma. As such, Kaye opined that Gonzalez's shoulder condition was not caused by the accident. Although Emas believed that the pain in Gonzalez's shoulder was related to the car accident, he was unaware of Gonzalez's prior issues with shoulder pain as reflected in her medical records. As such, the Court rejects Emas' causation opinion with respect to Gonzalez's shoulder, and finds Kaye's assessment more credible. Indeed, as outlined above, along with her back pain, Gonzalez had experienced chronic shoulder pain for years before the accident, and there is no evidence to suggest that the shoulder pain she is currently experiencing is any different than her pre-existing shoulder pain. Thus, the Court determines that Gonzalez fails to establish by the greater weight of the evidence that the shoulder pain she experienced after the accident was causally related to the accident. As such, the Court will not award Gonzalez any damages for her visits to Northrup to treat her shoulder pain. Moreover, because Gonzalez did not report shoulder pain until almost a month after the accident, and was not forthcoming with Emas regarding her history of shoulder pain, the Court finds that the left shoulder MRI was not reasonably necessary to determine whether the <u>accident</u>

caused any further injury to her shoulder. Therefore, the Court will not award damages for this diagnostic testing. See Finkel v. Batista, 202 So. 3d 913, 916 (Fla. 3d Dist. Ct. App. 2016).

### iii. Hands

As with the aforementioned injuries, Gonzalez also fails to satisfy her burden of proof with respect to her wrist condition. Wirth and Von Thron both testified that the onset of carpal tunnel syndrome in Gonzalez's wrists was not related to the accident. These doctors explained that it was rare to develop carpal tunnel syndrome under these circumstances absent significant injury to the wrist causing fracture and swelling. Because Emas did not document any sign of trauma or injury to Gonzalez's wrists when he examined her on December 3, 2012, these doctors concluded that the carpal tunnel syndrome was not related to the accident. Indeed, the first mention of hand swelling in Gonzalez's post-accident medical records is nearly two months after the accident, on January 25, 2013, and based on Gonzalez's report of hand swelling to Emas. The Court is persuaded by the opinions of Wirth and Von Thron regarding the onset of Gonzalez's carpal tunnel syndrome.[15] As such, Gonzalez has failed to establish that it is more likely than not that the accident caused the onset of carpal tunnel syndrome in her wrists.

---

[15] Emas maintains that Gonzalez developed carpal tunnel syndrome as a result of the accident because she had not experienced these symptoms before. Emas acknowledged, however, that a pre-existing issue with her hands would change his diagnosis. The Court notes that in September of 2011, Gonzalez reported to her primary care doctor, Elyssa Blissenbach, M.D., that she had tripped over her treadmill during the night and fell, injuring her left hand. Ex. 19, BLISSENBACH_0075. She had symptoms of pain and swelling in her hand following the fall and obtained an x-ray of her left hand on September 14, 2011, which was negative for a fracture. Ex. 46, SVMCR_0003. Notably, in subsequent appointments with Blissenbach over the following two months, Gonzalez's list of "Current Problems" included "hand swelling." Ex. 19, BLISSENBACH_0043, 0048, 0054, 0060, 0064, 0070. Although the injury to her wrist appears to have resolved prior to the car accident, the Court notes this fall as another example of relevant medical history that Gonzalez failed to disclose to Emas. Thus, while it is possible the car accident caused the onset of carpal tunnel syndrome, in light of Wirth and Von Thron's assessment, and Gonzalez's general lack of credibility, the Court finds it more probable that the carpal tunnel was pre-existing.

However, unlike the shoulder pain, Gonzalez did complain of numbness in her hands on her initial visit to Emas. Thus, as with the cervical MRI, the Court finds that the nerve study was diagnostic testing reasonably necessary to determine whether the accident caused nerve injuries related to Gonzalez's symptoms.

**D.    Damages**

In light of the foregoing, the Court concludes that Gonzalez suffered non-permanent, muscle strains as a result of the accident. Because Gonzalez was not permanently injured from the accident, Gonzalez may not recover non-economic damages such as "pain, suffering, mental anguish, and inconvenience because of bodily injury, sickness, or disease . . . ." See Fla Stat. § 627.737(2). Likewise, because Gonzalez did not suffer permanent injury, her husband is not entitled to damages on his claim for loss of consortium. See Faulkner v. Allstate Ins. Co., 367 So. 2d 214, 217 (Fla. 1979); see also Fla. Std. Jury Instr. (Civil) 501.3.

With respect to her medical expenses, Gonzalez may not recover for her two back surgeries, pain management therapies, or the ongoing treatment of her chronic neck and back pain because she has failed to establish that her chronic pain and need for treatment was caused by the accident. Nor may Gonzalez recover for the treatment of her pre-existing shoulder pain and wrist condition. However, as stated above, Gonzalez did incur some related medical expenses in the months following the accident. Specifically, the Court finds that Gonzalez's appointments with Emas in December and January, the five physical therapy sessions following the accident, her initial prescription medications, the cervical MRI and the nerve conduction study were all reasonably incurred medical

expenses resulting from the accident. In total, this medical care amounts to $4,084 in past medical expenses.

However, it is undisputed that Gonzalez received approximately $10,000.00 in benefits from her Personal Injury Protection (PIP) automobile coverage. See Pre-Trial Statement (Doc. 49) at 25. Pursuant to section 627.736(3) of the Florida Statutes, "[a]n injured party who is entitled to bring suit under the provisions of ss. 627.730-627.7405, or his or her legal representative, shall have no right to recover any damages for which personal injury protection benefits are paid or payable." As such, the parties agree that Gonzalez's medical damages award must be reduced by the amount of PIP benefits she received. In addition, the parties agree that this damage award is also subject to reduction based on the amount of any contractual discounts. Accordingly, on January 6, 2017, the parties filed the Joint Stipulation Regarding Post Trial Off-Sets and Contractual Discounts (Doc. 81; Off-Set Stipulation). In the Off-Set Stipulation, the parties set forth the portion of Gonzalez's medical bills that were paid by PIP, as well as the contractual discounts that Gonzalez received. Thus, taking into account the PIP payments and contractual discounts set forth in the Off-Set Stipulation with respect to the recoverable medical expenses, the Court finds that Gonzalez is entitled to an award of $1,408.47.

The Court next considers Gonzalez's claim for lost wages. Florida law permits the recovery of "[a]ny earnings . . . lost in the past and any loss of ability to earn money in the future." Fla. Std. Jury Instr. (Civil) 501.3(b). Gonzalez missed work the day after the accident, November 30, 2012, because she spent the day at the DMV securing alternate transportation. The following week, Gonzalez worked only twenty hours, missing work on Monday, December 3, 2012, at least partly due to an appointment with Emas. It is unclear

when or why Gonzalez missed the remaining days of work that week, although on December 4, 2012, she spent part of the afternoon obtaining estimates for car repairs. However, Gonzalez returned to work, and did not miss another scheduled work day until she called in sick due to pink eye on January 22, 2013. Although Gonzalez's employer moved her to a part-time schedule shortly after the accident, the Court credits Ferrelli's explanation that this change was the result of Gonzalez's chronic absenteeism and not due to the accident. Likewise, the Court accepts Ferrelli's testimony that Gonzalez ultimately separated from her employment in early February for reasons unrelated to the car accident.

The parties dispute whether Gonzalez's medical condition prevents her from working but, even assuming that Gonzalez has been and continues to be unable to work due to her chronic pain, because the Court does not attribute Gonzalez's chronic pain to the accident, Gonzalez cannot recover any lost future earnings. Moreover, while the Court accepts that Gonzalez was unable to attend work on November 30, 2012, due to transportation issues, and on December 3, 2012, due to the visit to Dr. Emas, Gonzalez fails to establish that she missed any other work days as a result of the accident. Indeed, Gonzalez did not testify to the reason she failed to show up for work on Tuesday, and thus, the evidence before the Court establishes only that Gonzalez missed Friday and Monday because of the accident. Based on Gonzalez's employment records, her lost income for the two days of missed work was: $232 ($14.50/hr x 16 hours). However, Gonzalez also received PIP payments for her lost wages during this period, which must be set-off against this award.[16] As such, the Court determines Gonzalez is entitled to an award of $92.80 for lost wages.

---

[16] The Off-Set Stipulation shows that Gonzalez received $208.80 from her PIP insurance for twenty-four hours (i.e., three, eight-hour days) of lost wages from 11-30-12 through 12-04-12. See Joint Stipulation at

Finally, in Count III of the Amended Complaint, Gonzalez seeks an award for the damage done to her minivan. "Generally, damages for the wrongful injury of property are measured either by the diminution in the value of the property, referred to as the diminution in value rule, or by the costs of repairing or restoring the property to its condition prior to the injury, referred to as the restoration rue." See Santa Rosa Golf Assocs., Inc. v. Haraway, 998 So. 2d 1166, 1167 (Fla. 1st Dist. Ct. App. 2008). Indeed, the Florida Standard Civil Jury Instructions instruct that the measure of any damage to a plaintiff's vehicle is "the difference between the value of the [automobile] immediately before [the accident] and its value immediately afterward," or "the reasonable cost of repair, if it was practicable to repair the [automobile], with due allowance for any difference between its value immediately before the [accident] and its value after repair." See Fla. Std. Jury Instr. (Civil) 501.3(c).

At the bench trial, Gonzalez submitted two estimates, prepared by automobile repair shops, of the cost to repair her vehicle following the accident. One repair shop estimated the cost to be $1,940.23, and the other put the cost at $1,651.49. Gonzalez did not actually incur these repair costs, and testified that she could not afford to pay for the repairs. Instead, Gonzalez's husband and brother performed some repairs to the vehicle, and Gonzalez drove it for several more months. Neither party presents any evidence regarding the diminution in value of the minivan due to the accident, although evidence of record indicates that Gonzalez traded-in the vehicle several months after the accident for a credit of $900. In the absence of any evidence indicating that these repairs would have enhanced

---

12. As the Court only found sixteen hours of lost wages recoverable in that time period, the corresponding amount covered by PIP was $139.20. To prevent a duplicate recovery for those sixteen hours, the Court will discount her award by $139.20.

the value of the vehicle above its pre-accident condition, or that the repair costs outweighed the diminution in the value of the vehicle, the Court finds Gonzalez is entitled to recover $1,651.49 in property damages. See McHale v. Farm Bureau Mut. Ins. Co., 409 So. 2d 238, 239-40 (Fla. 3d Dist. Ct. App. 1982).

Thus, the Court finds that Gonzalez is entitled to a total damages award as follows:

| | |
|---|---|
| Past Medical Care: | $ 1,408.47 |
| Lost Wages: | $ 92.80 |
| Property Damages: | $ 1,651.49 |
| | |
| Total: | $ 3,152.76 |

Accordingly, it is

**ORDERED**:

As to Counts I and III of the Amended Complaint (Doc. 5), the Clerk of the Court is directed to enter judgment in favor of Radanna S. Gonzalez and against the United States of America in the amount of $3,152.76. As to Count II of the Amended Complaint, the Clerk is directed to enter judgment in favor of the United States of America and against Keith Gonzalez. The Clerk is further directed to terminate all pending motions and deadlines as moot and close the file.[17]

**DONE AND ORDERED** in Jacksonville, Florida, this 5th day of May, 2017.

MARCIA MORALES HOWARD
United States District Judge

---

[17] The Court notes that the docket indicates that the Amended Defendant's Motion in Limine to Limit Testimony of Medical Witnesses and/or Expert Witnesses (Doc. 46) is still pending. However, on September 19, 2016, the Court granted the Motion, in part, and took it under advisement, in part. See Minute Entry (Doc. 54). The Court took the Motion under advisement to allow the government to identify the specific portions of Hess's deposition testimony that it found objectionable. The government filed its specific objections thereafter, and the Court ruled on those objections at trial. As such, the remainder of this Motion was fully resolved at trial.

lc11
Copies to:

Counsel of Record
Pro Se Parties